(189 P.3d 535)
No. 98,443

In the Matter of the Application of WESTBORO BAPTIST CHURCH
FOR EXEMPTION FROM AD VALOREM TAXATION IN SHAWNEE
COUNTY, KANSAS.

28

Opinion filed July 25, 2008.

*Margie J. Phelps,* of Topeka, and *Rebekah A. Phelps-Davis,* of Phelps-Chartered, of Topeka, for appellant Westboro Baptist Church.

*Shawn S. Leisinger,* assistant county counselor, and *Richard V. Eckert,* county counselor, for appellee Board of Shawnee County Commissioners.

Before MCANANY, P.J., GREEN and CAPLINGER, JJ.

GREEN, J.: Westboro Baptist Church (WBC) appeals from an order of the State Board of Tax Appeals (BOTA) denying its application for exemption from ad valorem taxes for its 2002 Ford F-150 truck. WBC argues that BOTA erroneously interpreted and applied the law pertaining to its application when it determined that WBC was not entitled to a personal property exemption under K.S.A. 79-201 *Second.* In particular, WBC maintains that because it used the truck in its religious activities, BOTA's decision was erroneous. Moreover, WBC maintains that BOTA improperly labeled as nonreligious many of its signs in violation of the Establishment Clause of the First Amendment to the United States Constitution. We agree. Nevertheless, we determine that BOTA's decision, even though improper, may be upheld for another reason. We further determine that WBC's political activities and secular

philosophy, which constitute a significant part of its picketing activities, preclude a tax exemption for its truck. Accordingly, we affirm.

WBC is an independent church based in Topeka, Kansas. Nearly all of the approximately 70 WBC members participate in an activity alternatively referred to by WBC members as "picketing" and "street ministry." This activity consists of transporting handmade signs to various locations around the country, including churches, military funerals, government offices, political conventions, and other locations. The signs generally express in acrimonious language the WBC's religious message regarding "whether and who God loves or hates." WBC members believe that they are God's messengers on earth, and it is their duty to publish the message that God has punished and will continue to punish the United States because of the country's willingness to condone homosexuality.

WBC filed an application for a tax exemption before BOTA in 2002 for a 2002 Ford F-150 truck purchased August 31, 2002. According to the application, the truck was to be used exclusively for WBC's street ministry and qualified for exemption under the religious use exemption set forth in the Kansas Constitution and K.S.A. 79-201 *Second*.

*Prior Appeals*

WBC has had two previous appeals before this court relating to religious use personal property exemptions for the 1995 Ford F-150 pickup truck it formerly used to transport signs. In WBC's first application, WBC requested a religious use exemption for a 1995 Ford F-150 pickup truck used to transport signs for its street ministry picketing activities. In denying the exemption, BOTA determined that the truck had not been used exclusively for religious purposes because it had regularly carried signs containing nonreligious messages. WBC appealed BOTA's ruling, arguing that BOTA had erred in determining that the nonreligious use of the vehicle had not been minimal in scope and insubstantial in nature. WBC also challenged the constitutionality of BOTA's decision. This court determined that WBC had failed to meet its burden to

show how the signs transported in the truck clearly fell within the religious use exemption. Because WBC failed to meet its burden of proof, this court declined to address its constitutional arguments. *Westboro Baptist Church, Inc. v. Hixon*, case No. 81,993, unpublished opinion, filed February 18, 2000, slip op. 4-5.

In 2001, WBC's request for tax exempt status for their 1995 Ford pickup truck again came before BOTA. Before BOTA ruled on the application, however, WBC moved to voir dire all BOTA members about whether the members had ever made any statements, signed any written documents, or read any information about WBC's picketing activities. BOTA denied the motion, and WBC moved to reconsider and to stay the tax proceeding until it could pursue an interlocutory appeal. BOTA denied reconsideration but stayed the tax proceeding pending the interlocutory appeal. WBC filed a petition for mandamus or, alternatively, for declaratory or injunctive relief, in the district court against four members of BOTA. In the action, WBC asked for an order requiring the four members to answer the proffered voir dire questions. Moreover, WBC's petition alleged a cause of action under 42 U.S.C. § 1983 (2000). BOTA moved to dismiss for lack of jurisdiction. BOTA argued that WBC had failed to exhaust its administrative remedies, specifically K.S.A. 2003 Supp. 77-514, which governs disqualification of a BOTA member. The district court dismissed WBC's claim for lack of subject matter jurisdiction due to WBC's failure to exhaust administrative remedies, and this court affirmed on appeal. *Westboro Baptist Church, Inc. v. Patton*, 32 Kan. App. 2d 941, 93 P.3d 718, *rev. denied* 278 Kan. 852 (2004).

*Present Appeal*

In WBC's present application for tax exemption, WBC requested exemption for its newly purchased 2002 truck. Before the hearing on the application, WBC moved to clarify the issue to be argued at the hearing. In response, BOTA issued an order stating that the issue to be argued at the hearing was " 'whether the subject properties are used exclusively for religious purposes' " and that "[w]hat constitutes a 'religious purpose' is a legal and factual issue for the Board's determination."

WBC submitted exhibits with all of the slogans they have used over the years in their street ministry and an exhibit enumerating several examples of biblical prophets preaching to government officials. WBC member Katherine Hockenbarger explained she had created the exhibit by organizing all of the signs alphabetically and by subject matter into the following categories: "America," "Churches," "General Doctrinal," "God's Punishment," "Homosexuals," "Institutions," "Other Countries," and "Public Figures." Hockenbarger and fellow WBC member Shirley Phelps-Roper described the process for creating a sign and selecting a picketing target. According to Hockenbarger, any member of WBC could suggest a message to put on a picketing sign. She described it as a collaborative process that did not require any type of centralized approval. According to Phelps-Roper, WBC members communicated either orally or in written e-mails when something would come up in the newspaper. Anyone could suggest a place to picket although the members did not always discuss the targets or act on a recommendation. Hockenbarger said WBC published its message anywhere there were people to hear it, such as political, entertainment, or religious events.

Hockenbarger testified that she had been a member of the church for 8 years, picketed nearly every day, and had participated in the WBC's picketing since WBC began picketing 15 years ago. Hockenbarger stated that she did not believe the signs expressed a political viewpoint and that she did not carry them for a political purpose. Instead, her "goal [was] simply to tell the people how things [were] and how they should be properly living their lives." For an example of where WBC would picket, Hockenbarger stated that WBC had picketed the Democratic and the Republican conventions. She denied that the purpose of the picketing was political. Hockenbarger explained: "The purpose was to publish a message, particularly about the candidates that were to be nominated, to make sure that people understood the ramifications of putting a person into a place of power that doesn't serve the Lord their God." In reference to a sign about a local political figure, Hockenbarger explained why she believed the sign about the political figure was not political in nature:

"[T]he reason that we hold it isn't because we are—we care about the politics of it. We care about the mores of our society. We care about the moral issues of when you select a person to hold a position of power that is an open, out of the closet lesbian and what that teaches our children and that teaches them that that is a perfectly acceptable life-style and God Almighty said it's not."

Hockenbarger denied she expected to have any influence on the political outcome; in fact, she fully expected the person would still be put into office. Hockenbarger stated that she believed 99% of the time, the picketing had no influence on whether a community continued to support the targeted individual or organization.

Elizabeth Phelps, a member of the church, also testified that WBC's picketing activities were not done to influence government officials or change their behavior. Phelps testified that her decision to picket was based on Bible scriptures of prophets, apostles, and Christ. She maintained that the scriptures showed that Christ, apostles, and prophets spoke directly to the leaders of their day. Phelps testified that she sincerely held to her beliefs and that the passages helped form her decisions on whom to picket.

While Phelps testified that she voted and participated in politics, she maintained that those activities were unrelated to the picketing and did not involve use of WBC's truck. Phelps denied engaging in politics on behalf of WBC and stated that when she does engage in political activity she uses her own resources.

Based on the evidence presented at the hearing, BOTA found it was undisputed that WBC had used the truck exclusively, actually, and regularly to facilitate WBC's picketing activities by transporting church members and signs. Nevertheless, BOTA noted it was less clear whether the picketing activities served an exclusively religious purpose within the meaning of K.S.A. 79-201 *Second*. BOTA acknowledged that WBC members sincerely believed that all of their signs conveyed their religious beliefs, even though a large number of the signs made no reference to their doctrine or anything remotely religious. BOTA stated that of the 602 examples of WBC's picket signs listed in the exhibits, at least 260 simply labeled public figures and institutions with terms such as "fag," "dyke," "whore," "pervert," or "Nazi."

In its analysis, BOTA relied on our Supreme Court's definition of religion as stated in *Trustees of The United Methodist Church v. Cogswell*, 205 Kan. 847, 852, 473 P.2d 1 (1970). In *Cogswell*, citing *Davis v. Beason*, 133 U.S. 333, 33 L. Ed. 637, 10 S. Ct. 299 (1890), our Supreme Court defined religion as "being an apprehension, awareness or conviction of the existence of a supreme being controlling one's destiny." " 'The term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.' [Citation omitted.]" 205 Kan. at 852.

BOTA analyzed whether the signs fell within the definition of religion and stated:

> "On their face, these labeling signs convey no message, doctrine, position or opinion falling within *Cogswell's* broad definition of 'religion.' Merely stating that an individual or institution is a 'fag' or 'dyke' or supporter thereof, while potentially inflammatory, does not reflect 'one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.' 205 Kan. at 852. While accepting that the applicant believes the signs convey their sincerely-held religious message, the Board finds that these signs in fact convey no religious message and thus serve no religious purpose."

Because BOTA found that WBC had failed to show that the truck was used to transport only signs conveying a religious message to street-side display locations, BOTA held that the truck did not qualify for the exclusively religious use property tax exemption. BOTA further found that because the nonreligious signs represented over 40 percent of WBC's signs, the truck did not qualify for the exception found in K.S.A. 79-201 *Second* which extends the exemption to properties used for a nonexempt purpose when the use was minimal in scope and insubstantial in nature.

WBC moved for reconsideration. In the motion, WBC contested BOTA's conclusion that some of the signs conveyed nonreligious messages. WBC maintained that it had satisfied its burden to show the religious nature of its picketing activity. WBC asked BOTA to explain its reasoning for asserting no First Amendment to the United States Constitution issue was involved, and WBC further asserted that BOTA had violated the Free Exercise Clause of the First Amendment by attempting to determine whether the words

from WBC's picketing signs were religious. WBC cited biblical passages employing the words singled out by BOTA as nonreligious and explained the religious meaning and etymology of the words. WBC challenged BOTA to specifically identify the 40 percent of the signs which had no religious meaning and requested the opportunity to explain the religious meaning behind the words used in those signs.

Finding WBC had failed to raise any persuasive argument in its motion to reconsider, BOTA denied the motion.

*Did BOTA Err as a Matter of Law by Denying the Exemption?*

On appeal, WBC argues that BOTA erroneously characterized WBC's picketing activity as nonreligious. WBC maintains that BOTA should have deferred to WBC's subjective interpretation of what constitutes a religious purpose, focusing on the sincerity of WBC's members' beliefs that the content of their picketing signs fulfill the religious purpose of their street ministry.

The standard of judicial review of an administrative agency action is defined by the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq. National Council on Compensation Ins. v. Todd*, 258 Kan. 535, 538, 905 P.2d 114 (1995). The applicable standard of review for a BOTA order is governed by K.S.A. 77-621(c), which provides that this court may grant relief if it determines any one or more of the following:

"(1) The agency action, or the statute or rule and regulation on which the agency action is based, is unconstitutional on its face or as applied;

"(2) the agency has acted beyond the jurisdiction conferred by any provision of law;

"(3) the agency has not decided an issue requiring resolution;

"(4) the agency has erroneously interpreted or applied the law;

"(5) the agency has engaged in an unlawful procedure or has failed to follow prescribed procedure;

"(6) the persons taking the agency action were improperly constituted as a decision-making body or subject to disqualification;

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in

light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

In its first issue, WBC argues that BOTA erroneously interpreted or applied the law under subsection (4). Whether certain property is exempt from ad valorem taxation is a question of law if the facts are agreed upon, but it is a mixed question of law and fact if the facts are controverted. *In re Tax Exemption Application of Via Christi Regional Med. Ctr.*, 27 Kan. App. 2d 446, 447, 6 P.3d 896 (2000) (citing *T-Bone Feeders, Inc. v. Martin*, 236 Kan. 641, 645, 693 P.2d 1187 [1985]). Here, the underlying facts are not disputed. Instead, WBC disputes BOTA's interpretation of the facts. Therefore, this appeal presents a question of law.

The determination of whether WBC's use of the truck fulfills a religious purpose as a matter of law implicates both the rules of statutory interpretation and an analysis of the First Amendment to the United States Constitution. To the extent this appeal requires construction and application of a tax exemption statute, the general rules for statutory construction are applicable. The fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. The legislature is presumed to have expressed its intent through the language of the statutory scheme. Ordinary words are given their ordinary meanings. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. *Winnebago Tribe of Nebraska v. Kline*, 283 Kan. 64, 77, 150 P.3d 892 (2007).

In exemption cases, taxation is the rule, and exemption is the exception. Constitutional and statutory provisions exempting property from taxation are to be strictly construed against the party claiming exemption, and all doubts are to be resolved against exemption. *In re Tax Application of Lietz Constr. Co.*, 273 Kan. 890, 904-05, 47 P.3d 1275 (2002); *Tri-County Public Airport Auth. v. Board of Morris County Comm'rs*, 245 Kan. 301, 304-05, 777 P.2d 843 (1989). BOTA is a specialized agency that exists to decide taxation issues and is considered the paramount taxing authority in

Kansas. Appellate courts grant BOTA's decisions great weight and deference when it is acting in its area of expertise. The party challenging BOTA's decision has the burden to prove that the action taken was erroneous. Nevertheless, if BOTA's interpretation of law is erroneous as a matter of law, appellate courts will take corrective steps. *In re Tax Appeal of Sprint Communications Co.*, 278 Kan. 690, 694-95, 101 P.3d 1239 (2004).

All property in Kansas, real and personal, that is not expressly exempt by statute is subject to taxation. K.S.A. 79-101. Under both the Kansas Constitution and K.S.A. 79-201 *Second*, property used exclusively for religious purposes is exempt from property taxation. Our Constitution states:

"All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, farm machinery and equipment, merchants' and manufacturers' inventories, other than public utility inventories included in subclass (3) of class 2, livestock, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation." Kan. Const. Art. 11, § 1(b) (2007 Supp.).

While the legislature can broaden the exemption permitted by the constitution, it cannot limit or curtail the constitutional provisions. *Cogswell*, 205 Kan. at 853. Consequently, K.S.A. 79-201 *Second* also exempts property used exclusively for religious purposes. Moreover, in 1986 the legislature permissibly extended the exemption to properties used for a nonexempt purpose when the use was minimal in scope and insubstantial in nature, but only if the use was incidental to religious purposes. L. 1986, ch. 369, § 1. K.S.A. 79-201 *Second* states in part:

"All real property, and all tangible personal property, actually and regularly used exclusively for literary, educational, scientific, religious, benevolent or charitable purposes, including property used exclusively for such purposes by more than one agency or organization for one or more of such exempt purposes. Except with regard to real property which is owned by a religious organization, is to be used exclusively for religious purposes and is not used for a nonexempt purpose prior to its exclusive use for religious purposes which property shall be deemed to be actually and regularly used exclusively for religious purposes for the purposes of this paragraph, this exemption shall not apply to such property, not actually used or occupied for the purposes set forth herein, nor to such property held or used as an investment even though the income or rentals received therefrom is used

wholly for such literary, educational, scientific, religious, benevolent or charitable purposes. . . . This exemption shall not be deemed inapplicable to property which would otherwise be exempt pursuant to this paragraph because an agency or organization: . . . (c) uses such property for a nonexempt purpose which is minimal in scope and insubstantial in nature if such use is incidental to the exempt purposes of this paragraph."

See *Woman's Club of Topeka v. Shawnee County*, 253 Kan. 175, 187, 853 P.2d 1157 (1993) (noting that prior to the legislature's modification of the statute in 1986, the exemption statute mirrored the Kansas constitutional provision and provided exemption only when the subject property was used exclusively for the exempt purpose); *Midwest Presbytery v. Jefferson County Appraiser*, 17 Kan. App. 2d 676, 677-79, 843 P.2d 277 (1992) (addressing the 1986 amendment to 79-201 *Second* as an issue of first impression and holding use of religious property as a residence did not defeat the exclusive use requirement as a matter of law).

In *Cogswell*, 205 Kan. 847, which BOTA cited in its order denying the exemption, the court defined a religious purpose in the context of the tax exemption statute. In that case, the court had to determine whether the United Methodist Church's administration offices satisfied the religious purpose language of the exemption statute. In *Cogswell*, the court defined the term "religious" as follows:

"[T]he adjective form of the word 'religion' [is] defined as being an apprehension, awareness or conviction of the existence of a supreme being controlling one's destiny. [Citation omitted.] . . .

'It has been held that "religion" has reference to man's relation to Divinity; to reverence, worship, obedience, and submission to the mandates and precepts of supernatural or superior beings. In its broadest sense it includes all forms of belief in the existence of superior beings, exercising power over human beings by volition, imposing rules of conduct with future rewards and punishments. [Citations omitted.]'

. . . .

'The term "religion" has reference to one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.' . . . [Citation omitted.]" 205 Kan. at 852.

The court noted it had always employed the term "religious" broadly and in light of the foregoing definitions. 205 Kan. at 852.

Nevertheless, in determining that the administration building satisfied the exemption statute, the court examined the underlying activities conducted in the administration building:

"[T]here is nothing to show that any part of the use of the building in the administration of the Conference activities embraced political action or activities which would remove the property from its tax exempt status. But if it can be said educational, benevolent and charitable purposes are embraced within the administrative activities of the Conference in using the property for religious purposes, the use of the property for such purposes, on the facts here presented, is likewise exempt from taxation under the constitution." 205 Kan. at 861.

Thus, the court emphasized that all of the activities occurring in the administration building satisfied benevolent, charitable, and educational purposes, which were exempt from taxation under the constitution, in using the property for religious purposes and that none of the church's activities in the administration building were political. 205 Kan. at 861

Similarly, Kansas courts have seemed to focus on the activities of an organization in determining whether the organization qualifies for exemption from payment of property taxes. For example, in *National Collegiate Realty Corp. v. Board of Johnson County Comm'rs*, 236 Kan. 394, 400, 690 P.2d 1366 (1984), the court declined to define the term "educational" and instead focused "on whether any activities in the use of the property *were not* exclusively for educational or other exempt purposes." In finding that the regulation of extracurricular intercollegiate athletic events was equivalent to teaching physical education, our Supreme Court determined that the purpose of the National Collegiate Athletic Association was educational. 236 Kan. at 404.

Likewise, in *In re Tax Exemption Application of Fire Baptized Holiness Church*, 28 Kan. App. 2d 598, 18 P.3d 308 (2001), the court evaluated the function of the property. The church sought a religious use tax exemption for a dormitory building which housed high school students, "dorm parents," and a cafeteria for elementary and high school students. BOTA denied the exemption, finding the dormitory's primary use was as a dormitory, a noneducational use. On appeal, the court noted that Kansas courts have endorsed a broad definition of education and cited several exam-

ples. Although the court held the occupancy of a residence did not by itself constitute an educational or religious use, the underlying purpose of the dormitory was for education because the dormitory building housed only students who attended the school and dorm parents whose duty it was to monitor the students. Students used the building every day for lunch and occasionally for physical education and music classes. Therefore, the court reversed BOTA's denial of the exemption. 28 Kan. App. 2d at 602; see also *Sigma Alpha Epsilon Fraternal Ass'n v. Board of County Comm'rs*, 207 Kan. 514, 519, 485 P.2d 1297 (1971) (holding that a college fraternity was not used exclusively for educational purposes because the property was used for many fraternal purposes, which included initiations, parties, and other social activities); *Kansas Wesleyan Univ. v. Saline County Comm'rs*, 120 Kan. 496, 497, 243 Pac. 1055 (1926) (granting an exemption for a university president's residence because official meetings and school gatherings held at the president's residence were part of the process by which the affairs of the institution were administered).

The County points to the general definition for religious activity suggested by this court in *Salvation Army v. Board of Johnson County Comm'rs*, No. 62,948, unpublished opinion filed August 11, 1989. Acknowledging the tax exemption statute did not specifically define religious purposes, this court suggested the following activities would fall within the scope of the statute:

" 'Typical activities of an organization operated for religious purposes would include (a) corporate worship services, including due administration of sacraments and observance of liturgical rituals, as well as a preaching ministry and evangelical outreach to the unchurched and missionary activity in partibus infidelium; (b) pastoral counseling and comfort to members facing grief, illness, adversity, or spiritual problems; (c) performance by the clergy of customary church ceremonies affecting the lives of individuals, such as baptism, marriage, burial, and the like; (d) a system of nurture of the young and education in the doctrine and discipline of the church, as well as . . . theological seminaries for the advanced study and the training of ministers.' [Citation omitted.]" Slip op. at 5.

Although this court accepted the Salvation Army's contention that the Weight Watchers program operated on the Salvation Army's property conformed to the religious mission of the Salvation Army,

this court held that Weight Watchers' profit-making status precluded tax exemption. Slip op. at 5-7. Thus, the Salvation Army failed to meet the exclusive use for religious purposes requirement.

Several other decisions have considered whether any activities in use of the property were not exclusively for religious purposes. Although none deals with our specific question—whether any uses of WBC's truck breached the exclusive use principle—these decisions give general guidance. *Defenders of the Christian Faith v. Board of County Commissioners*, 219 Kan. 181, 189, 547 P.2d 706 (1976) (finding commercial use of a portion of the building for which the exemption was sought rendered the entire building taxable when it was owned by the same entity even though the remainder of the building served exempt uses); *Seventh Day Adventist v. Board of County Commissioners*, 211 Kan. 683, 694, 508 P.2d 911 (1973) (denying religious use exemption for teachers' residences because no educational purposes occurred at the residences and denying religious use exemption for commercial ventures employing students of the religious school); *Sunday School Board of the Southern Baptist Convention v. McCue,* 179 Kan. 1, 7-8, 293 P.2d 234 (1956) (denying exemption to a church-owned publisher of religious material, holding that selling religious publications for more than actual cost was not a for religious purposes); *Kansas City Dist. Advisory Bd. v. Board of Johnson County Comm'rs*, 5 Kan. App. 2d 538, 542, 620 P.2d 344 (1980) (where outside groups were permitted to use church camp for nominal fee—camp not used exclusively for religious purposes).

As the abundant precedents previously cited have shown, not every activity in use of property of a religious or educational organization has been determined to be solely for religious or educational purposes. See *Feldstein v. Christian Science Monitor,* 555 F. Supp. 974, 978 (D. Mass. 1983) ("not every endeavor that is affiliated, however tenuously, with a recognized religious body may qualify as a religious activity of that body").

Although a party seeking free exercise protection under the First Amendment to the United States Constitution must assert a sincerely held belief, sincerity alone is not enough. In addition, the belief must also be religious. See *Benning v. Georgia,* 391 F.3d

1299, 1313 (11th Cir. 2004) ("[T]he First Amendment . . . requires [a court] to determine whether the asserted belief . . . is religious and sincerely held."); see also *Africa v. Pennsylvania,* 662 F.2d 1025, 1030 (3d Cir. 1981) ("A court's task is to decide whether the beliefs avowed are: [1] sincerely held, and [2] religious in nature, in the claimant's scheme of things."). As a result, a sincerely held religious belief alone is inadequate to establish a free exercise claim. If that were not the case, any sincere act would be sacrosanct and potentially protected by the First Amendment.

For example, as one Illinois appellate court has pointed out, everything a deeply devout person does has a religious purpose:

"In a sense, everything a deeply devout person does has a religious purpose. But if that formulation determined the exemption from property taxes, religious identity would effectively be the sole criterion. A church could open a restaurant, for instance, and because waiters attempted to evangelize customers while taking their orders, the restaurant would be exempt. But the operation of a restaurant is not necessary for evangelism and religious instruction, although, like any other social activity, it can provide the occasion for those religious purposes." *Faith Builders Church, Inc. v. Department of Revenue,* 378 Ill. App. 3d 1037, 1046, 882 N.E.2d 1256 (2008).

*First Amendment*

Nevertheless, in determining whether WBC's operation of the truck was a religious activity, we must be wary of excessive government interference. The First Amendment to the United States Constitution declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The basic purpose of the two First Amendment provisions is to "insure that no religion be sponsored or favored, none commanded, and none inhibited." *Walz v. Tax Commission,* 397 U.S. 664, 669, 25 L. Ed. 2d 697, 90 S. Ct. 1409 (1970). The First Amendment will not tolerate either governmentally established religion or governmental interference with religion. Nevertheless, "short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality

which will permit religious exercise to exist without sponsorship and without interference." 397 U.S. at 669.

*Free Exercise Clause*

The purpose of the Free Exercise Clause of the First Amendment is to secure religious liberty to the individual by prohibiting any invasions thereof by the state and federal legislative powers. Even a regulation that is neutral on its face may in application offend the constitutional requirement for governmental neutrality if it unduly burdens the free exercise of religion. The United States Supreme Court has established a two-part analysis for determining whether legislation violates the Free Exercise Clause: Has the government placed a substantial burden on the observation of a central religious belief or practice, and, if so, does a compelling governmental interest justify the burden? *Swaggart Ministries v. Cal. Bd. of Equalization*, 493 U.S. 378, 384-85, 107 L. Ed. 2d 796, 110 S. Ct. 688 (1990).

The United States Supreme Court has held that the Free Exercise Clause does not require the State to grant exemptions to religious organizations from generally applicable taxes. *Swaggart Ministries*, 493 U.S. at 392. Tax exemptions are a matter of grace that state and federal legislatures may disallow as they choose. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983). The legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right because although the government may not place obstacles in the path of a person's exercise of the freedom, it need not remove those not of its own creation. 461 U.S. at 549-50. To the extent imposition of a generally applicable tax merely decreases the amount of money a person or religious organization has to spend on religious activities, any such burden is not constitutionally significant. *Hernandez v. Commissioner*, 490 U.S. 680, 104 L. Ed. 2d 766, 109 S. Ct. 2136 (1989). The economic cost associated with complying with generally applicable taxes is no different from other generally applicable laws and regulations, such as health and safety regulations, to which religious organizations must adhere. *Swaggart Ministries*, 493 U.S. at 392. Therefore, the collection and pay-

ment of a generally applicable tax imposes no constitutionally significant burden on religious practices or beliefs. 493 U.S. at 393.

For example, in *Swaggert Ministries*, California's sales tax law treated the sale of a Bible by a religious organization just as it would treat the sale of a Bible by a bookstore because both are retail sales of tangible personal property. The Court declined to find the appellant's religious activity, which consisted of selling Bibles for religious purposes, was singled out for special and burdensome treatment because the appellant had to pay the same sales tax that nonreligiously motivated book sellers must pay. 493 U.S. at 389-90. The Court also rejected the appellant's argument that it received an increased tax burden from the imposition of the sales tax. The Court held that the tax did not constitute a constitutionally significant burden on the organization's religious practices or beliefs. 493 U.S. at 392.

### Establishment Clause

The First Amendment does not require total separation between church and state, and total separation is not possible in an absolute sense. *Walz*, 397 U.S. at 670. Some relationship between government and religious organizations is inevitable. There are three tests that a government regulation or law must pass if it is challenged under the Establishment Clause: (1) the statute must have a secular legislative purpose; (2) the statute's primary effect must be one that neither advances nor inhibits religion; and (3) the statute must not produce an excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 29 L. Ed. 2d 745, 91 S. Ct. 2105 (1971).

First, state property tax exemptions that benefit religious organizations do not violate the Establishment Clause. *Walz*, 397 U.S. at 666-67, 674 (holding that a tax exemption for "religious organizations for religious properties used solely for religious worship," as part of a general exemption for nonprofit institutions, did not violate the Establishment Clause). The purpose of property tax exemptions is neither the advancement nor the inhibition of religion.

Second, because the legislative purpose of a property tax exemption is neither the advancement nor the inhibition of religion, the United States Supreme Court has held property tax exemptions serve a secular purpose:

"[I]t is undeniable that a generally applicable tax has a secular purpose and neither advances nor inhibits religion, for the very essence of such a tax is that it is neutral and nondiscriminatory on questions of religious belief. Thus, . . . [the Establishment Clause's] undisputed core values are not even remotely called into question by the generally applicable tax in this case." *Swaggart Ministries*, 493 U.S. at 394.

Legislative property tax exemptions for certain entities, including religious organizations, hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups, serve to recognize that those entities exist in a "harmonious relationship to the community at large." These groups provide beneficial and stabilizing influences in community life, and States find this classification useful, desirable, and in the public interest. *Walz*, 397 U.S. at 672-73. As a result, the benefit conferred by property tax exemptions applies equally to all charitable organizations, religious and nonreligious alike.

Third, entanglement must be "excessive" before it runs afoul of the Establishment Clause. *Agostini v. Felton*, 521 U.S. 203, 233, 138 L. Ed. 2d 391, 117 S. Ct. 1997 (1997). "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon*, 403 U.S. at 614. The factors used to assess whether an entanglement is "excessive" are "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." *Agostini*, 521 U.S. at 232.

Typically, a tax "exemption creates only a minimal and remote involvement between church and state and far less than taxation of churches. It restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other." *Walz*, 397 U.S. at 676. Historically, tax exemptions for religious organizations have not re-

sulted in an entanglement problem. See 397 U.S. at 676-77 ("Few concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exercise generally so long as none was favored over others and none suffered interference."). Routine regulatory interaction, such as the application of neutral tax laws, that does not involve inquiries into religious doctrine, delegation of state power to a religious body, or detailed monitoring and close administrative contact between secular and religious bodies, does not of itself constitute entanglement. *Hernandez*, 490 U.S. 680, 696-697, 104 L. Ed. 2d 766, 109 S. Ct. 2136 (1982).

Nevertheless, unlike mere regulatory interaction, state action that involves interpreting and weighing church doctrine violates the entanglement clause of the Establishment Clause. *Presbyterian Church v. Hull Church*, 393 U.S. 440, 451-52, 21 L. Ed. 2d 658, 89 S. Ct. 601 (1969) (civil courts must not engage in the forbidden process of interpreting and weighing church doctrine). The United States Supreme Court has repeatedly stated that government action that involves inquiry into religious doctrine poses an entanglement problem of constitutional proportions. See *Lemon*, 403 U.S. at 621-22 (statute authorizing government inspection of parochial school records created impermissible "intimate and continuing relationship between church and state" because it required State "to determine which expenditures are religious and which are secular").

Here, WBC has not shown that the Kansas tax exemption statute singled it out for special and burdensome treatment. BOTA's denial of the property tax exemption would admittedly result in a higher tax burden for WBC, but under United States Supreme Court precedents, a higher tax burden is not a constitutionally significant burden in most circumstances. WBC provides no evidence BOTA's decision to deny the personal property exemption would render its street ministry " 'crushed and closed out by the sheer weight of the toll or tribute which is exacted town by town.' [Citation omitted." *Swaggart Ministries*, 493 U.S. at 392. Moreover, in stating that the duty to pay taxes is so vital that it overrides the

right of free exercise, it was stated: "The necessities of revenue collection through a sound tax system raise governmental interests sufficiently compelling to outweigh the free exercise rights of those who find the tax objectionable on bona fide religious grounds." *Wall v. U.S.,* 756 F.2d 52, 56 (8th Cir. 1985). See *United States v. Lee,* 455 U.S. 252, 260, 71 L. Ed. 2d 127, 102 S. Ct. 1051 (1982).

WBC has not shown that without the exemption its ability to observe a central religious practice will be foreclosed. In light of United States Supreme Court precedents, WBC's claim does not satisfy the first prong of the free exercise inquiry. Therefore, WBC does not articulate a sustainable free exercise claim.

*Defining Religious Use*

Because K.S.A. 79-201 *Second* does not define religious use, Kansas case law has attempted to define the statutory term. *Cogswell,* 205 Kan. at 852. Kansas case law definitions have not discussed the content of a religious organization's doctrinal beliefs. See *Defenders of Christian Faith,* 219 Kan. at 189; *Seventh Day Adventist,* 211 Kan. at 693-94; *In re Tax Exemption Application of Fire Baptized Holiness Church,* 28 Kan. App. 2d at 601; *Kansas City Dist. Advisory Bd.,* 5 Kan. App. 2d at 542. Kansas case law has recognized preaching ministry and evangelical outreach as religious uses within the meaning of the tax exemption statute. *Salvation Army,* slip op. at 5. Kansas has rejected characterization of a use as religious if it involves commercial activity. *Defenders of Christian Faith,* 219 Kan. at 181; *Kansas City Dist. Advisory Bd.,* 5 Kan. App. 2d at 542; *Salvation Army,* slip op. at 5-7. Moreover, Kansas has not sanctioned political action or activities as a religious activity. *Cogswell,* 205 Kan. at 861.

*Did BOTA's Decision Violate the Establishment Clause by Excessive Government Entanglement?*

The United States Supreme Court has often held that " '[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.' " *Employment Div., Ore. Dept. of Human Res. v. Smith,* 494 U.S. 872, 887, 108 L. Ed. 2d 876, 110 S. Ct. 1595 (1990) (quoting *Hernandez,* 490 U.S. at 699).

Here, BOTA in its holding stated:

"The facts of this case show that although the Applicant's church members sincerely believe all of their signs convey their religious beliefs, a large number of the signs make no reference to their doctrine or anything remotely religious. Of 602 examples of WBC's picket signs in the record, at least 260 simply label non-religious public figures and institutions with terms such as 'fag,' 'dyke,' 'whore,' 'pervert,' or 'Nazi.'

"On their face, these labeling signs convey no message, doctrine, position or opinion falling within *Cogswell's* broad definition of 'religion.' Merely stating that an individual or institution is a 'fag' or 'dyke' or supporter thereof, while potentially inflammatory, does not reflect 'one's views of his relations to his Creator, and to the obligations they impose of reverence for his being and character, and of obedience to his will.' 205 Kan. at 852. While accepting that the applicant believes the signs convey their sincerely-held religious message, the Board finds that these signs in fact convey no religious message and thus serve no religious purpose.

"Because the applicant has failed to show that the subject property is used to transport only signs conveying a religious message to streetside display locations, it does not meet the exclusive use requirement. Further, the signs which serve no religious purpose represent over 40 percent of the signs on the applicant's list. The Board finds the non-religious purpose of a significant portion of the applicant's use of the subject property is more than insubstantial in nature and minimal in scope, and the subject property thus does not qualify for the exception found in subsection (c) of K.S.A. 79-201 *Second.*"

BOTA interpreted and weighed WBC's religious doctrine in determining whether WBC was entitled to the property exemption for its truck. Although stating that WBC's members sincerely believed their signs conveyed a religious message, BOTA labeled at least 260 signs as nonreligious. Moreover, BOTA determined that those signs served no religious purpose.

The United States Supreme Court has repeatedly held that government entanglement in religion becomes unconstitutionally excessive when state action involves interpreting and weighing church doctrine. *Swaggart Ministries,* 493 U.S. at 396; *Hernandez,* 490 U.S. at 696-97; *Presbyterian Church,* 393 U.S. at 451-52.

In *Thomas v. Review Bd., Ind. Empl. Sec. Div.,* 450 U.S. 707, 716, 67 L. Ed. 2d 624, 101 S. Ct. 1425 (1981), the United States Supreme Court clearly indicated that a court should not normally, over the objection of a party, label as nonreligious the statement or actions of that party. In *Thomas,* a Jehovah's Witness quit his

job because of his convictions against war when he was transferred to a plant which manufactured tanks. He maintained that he had quit for religious reasons, although he admitted that a fellow worker, who also was a Jehovah's Witness, did not share the same beliefs. In his later appeal over unemployment benefits, the Indiana Supreme Court determined that he had acted out of personal philosophical motives rather than for religious reasons. Nevertheless, the United States Supreme Court reversed, holding that it was not for a court to indulge in such refined analysis over the protest of one having honest religious convictions.

Because BOTA labeled as nonreligious many of WBC's signs, it violated the Establishment Clause. As a result, BOTA's decision was improper. Nevertheless, when an agency tribunal reaches the right result, its decision will be upheld even though the tribunal relied upon the wrong ground or assigned erroneous reasons for its decision. *In re Tax Appeal of Colorado Interstate Gas Co.,* 258 Kan. 310, 317, 903 P.2d 154 (1995).

The County argued that WBC's activities had a significant political component, which made it ineligible for the property exemption. On the other hand, WBC contended that all its signs were based upon its members' religious beliefs drawn from the Bible. Moreover, WBC maintained that its members' beliefs were apolitical. In its brief, WBC makes the following argument:

"Church members draw their beliefs from the Bible.

"All of the evidence in this record says that every word on every sign carried by Westboro in the truck at issue is Westboro's religious viewpoint. Scores of Bible verses were provided, in the exhibits, by the witnesses, and in the Petition for Reconsideration, which supported what Westboro members believe. . . . [e]ach citizen of this nation has the absolute right to reach his or her own conclusions about what is and is not Bible sentiment."

The obvious circularity of WBC's argument can be shown by its reconstruction:

The truck was used exclusively for religious purposes, because "every word on every sign carried by . . . 'the truck' was based on WBC's religious viewpoint" drawn from the Bible.
[Claim]

Why should we believe that?

Because "[s]cores of Bible verses were provided, in the exhibits, by the witnesses, and in the Petition for Reconsideration, which supported what Westboro members believe."
[Premise]

What reason do you have for saying that?

Because every "citizen of this nation has the absolute right to reach his or her own conclusions about what is and is not Bible sentiment."
[Premise]

The premises (1) that "[s]cores of Bible verses were provided . . . [which] WBC members believe" and (2) that every "citizen of this nation has the absolute right" to determine his or her own "Bible sentiment" means the same thing as the claim: that the truck was used exclusively for religious purposes, *because every sign carried in the truck was based on WBC's viewpoint drawn from the Bible.*

Hence, the Bible is given as a reason for the religious belief of WBC's members and the basis for the members' religious belief is drawn from their interpretation of the Bible. The premises prove the claim, and the claim proves the premises. The premises and the claim actually make the same claim. Based on this argument, WBC maintains that only it may define whether its activities are exclusively religious. It, however, cannot be the case that WBC may establish a free exercise claim merely by pronouncing that its

members possessed a sincere and religious belief related to its picketing activities.

Indeed, in stating that although "a church in this free country can adopt any belief it desires," the Commonwealth Court of Pennsylvania stated that this religious freedom had limits:

"Nowhere has it yet been held that one may, solely by virtue of his religious beliefs, exonerate himself from the payment of taxes. Neither has it been held that a church may proclaim that property it owns is exempt from taxation solely because the payment of such taxes would be offensive to its religious doctrines. Again, the reason why such exemptions have been narrowly proscribed by taxing authorities is quite sound. Governments depend upon tax revenues to furnish services essential for the welfare of all people. If churches or individuals could, by self-proclamation avoid the payment of taxes, good order in this country would be in jeopardy." *Appeal of Open Door Baptist Church,* 63 Pa. Cmwlth. 292, 296-97, 437 A.2d 1291 (1981).

Likewise, Kansas historically has followed the majority rule that property tax exemptions are strictly construed, and that taxation is the rule and exemption is the exception. See Buchele, *Justifying Real Property Tax Exemptions in Kansas,* 27 Washburn L.J. 252, 253 (1988).

"There is no doubt that '[o]nly beliefs rooted in religion are protected by the Free Exercise Clause.' " *Frazee v. Illinois of Employment Security Dept.,* 489 U.S. 829, 833, 103 L. Ed. 2d 914, 109 S. Ct. 1514 (1989). Moreover, purely secular views do not meet this requirement. *Wisconsin v. Yoder,* 406 U.S. 205, 215-16, 32 L. Ed. 2d 15, 92 S. Ct. 1526 (1972). "Nor do we underestimate the difficulty of distinguishing between religious and secular convictions and in determining whether a professed belief is sincerely held. States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause." *Frazee,* 489 U.S. at 833. Here, we do not have to concern ourselves about the sincerity or about the religious nature of WBC's members' convictions. BOTA did not question their sincerity, and the County concedes it.

In *Yoder,* the United States Supreme Court, in balancing the state's interest in compulsory education with the free exercise of

the tenets of the Amish religion, distinguished a secular belief from a sincerely held religious belief and stated:

"A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious belief. Although a determination of what is a 'religious' belief or practice entitled to constitutional protection may present a most delicate question, the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important interests. Thus, if the Amish asserted their claims because of their subjective evaluation and rejection of the contemporary secular values accepted by the majority, much as Thoreau rejected the social values of his time and isolated himself at Walden Pond, their claims would not rest on a religious basis. Thoreau's choice was philosophical and personal rather than religious, and such belief does not rise to the demands of the Religion Clauses." 406 U.S. at 215-16.

Although WBC maintains that its picket activities were exclusively for religious purposes, there is an obvious political component to its activities. WBC, for example, states in its briefs the following:

"Picket signs name individual elected leaders and other government and political officials and figures, so as to publish the fact that these officials do not live a proper life. An example given by one picketer is President Bush, who the picketer believes claims to be conservative, but nominates and selects for Cabinet positions or other important government positions, such as ambassador, people who are practicing homosexuals.

"The church members picket political events if the event is going to draw a large crowd for them to publish their message to, just like they would an entertainment event, a religious event, or any other kind of event. For instance, church members have picketed Democrat and Republican national conventions, with a purpose of publishing a message, not a political purpose. The purpose was to make sure people understood the ramifications of putting a person in a place of power who doesn't serve God."

These examples show that WBC believes that public and government officials, whom it believes to be ungodly, are being placed in positions of authority within the government. As a result, WBC seems to argue that it is promoting godly government with its message about public and government officials whom it believes to be ungodly. In essence, WBC is advocating a reform of government whenever it pickets a public or elected official.

Although stating that WBC's members did not care about the politics of picketing, Katherine Hockenbarger testified that the members cared about the moral attitudes of society:

"We care about the mores of our society. We care about the moral issues of when you select a person to hold a position of power that is an open, out of the closet lesbian and what that teaches our children and that teaches them that that is a perfectly acceptable life-style and God Almighty said it's not."

Moreover, Hockenbarger expressly admitted that her belief was in part a political point of view, stating: "I'm sure you could categorize that as political, but it is still mixed with my religious beliefs." Obviously, Hockenbarger's statement that we "select a person . . . of power" refers to the voting process. Moreover, her message can be tersely summed up in the following way: we need to support only candidates who will obey divine laws, not man's laws. Hockenbarger's statement underscores the fact that WBC has incorporated politics into its religious activities.

Although WBC's members steadfastly maintain that their message about public and elected officials is apolitical, a story about Abraham Lincoln during his trial attorney days may be helpful in understanding the members' assertion. Lincoln is said to have cross-examined a witness as follows:

" 'How many legs does a horse have?'
'Four,' said the witness.
'Right,' said Abe.
'Now, if you call the tail a leg, how may legs does a horse have?'
'Five,' answered the witness.
'Nope,' said Abe, 'callin' a tail a leg don't make it a leg.' " *Lamon v. McDonnell Douglas Corp.,* 19 Wash. App. 515, 534-35, 576 P.2d 426 (1978) (Andersen, J., dissenting).

So merely saying a message is apolitical does not make it so.

In balancing the government's interest in collecting taxes, the government has a right to make a limited inquiry as to whether WBC's activities in the use of the truck were exclusively for religious purposes. See *International Society for Krishna Consciousness v. Barber,* 650 F.2d 430, 433 (2d Cir. 1981) ("threshold inquiry into 'religious' aspect of particular beliefs and practices cannot be avoided"). The difficult problem we are confronted with relates to

the definition of "religious" and "secular" activities and the inter-relationship of these terms with each other. Affairs of government and politics, for example, are activities which historically have been considered secular. In particular, this country was founded as a secular state. The founders "created the first wholly secular state. . . . By insisting on the complete separation of church and state, the founders successfully overturned" the "long-standing pre-sumption . . . that shared religious convictions were the primary basis for the common values that linked together the people of any political community." Joseph J. Ellis, American Creation, p. 8 (2007).

A problem, however, arises when one attempts to draw a dis-tinction between those activities characteristic of secular life that are also pursued by religious organizations and those activities characteristic of religious life. The problem is vividly illustrated by Hockenbarger's statement that while her picketing activities in-volving public and elected officials could be categorized as political, these activities were mixed with her religious beliefs. Hockenbar-ger's statement indicates that she as well as the other WBC's mem-bers believe that they have a moral responsibility to make the state better.

The WBC's members, however, have chosen to do this politically by warning the public about allegedly ungodly public and elected officials and advocating the election of godly officials to office. In advocating the reform of local, state, and national government by their message, the WBC's members are engaged in a secular ac-tivity. As stated earlier, affairs of government and politics are sec-ular activities.

When a party asserts a belief that seems to be "far more the product of a secular philosophy than of a religious orientation," a free exercise claim can not be maintained. *Africa*, 662 F.2d 1025, 1033-34 (C.A. Pa. 1981) (contending that if the plaintiff's concern that he be given a raw food diet was considered "religious," the First Amendment might need to protect a "host of individuals and organizations who espouse personal and secular ideologies"). As a result, the attachment of a religious belief onto an otherwise secular activity, such as politics, does not establish a free exercise claim.

For example, if a religious organization could latch onto a secular activity and incorporate that activity into its religious activities based simply upon its members' sincerely held religious beliefs, the scope of free exercise claims would be stretched to an untenable degree. See *Faith Builders Church, Inc. v. Department of Revenue,* 378 Ill. App. 3d 1037, 1046, 882 N.E.2d 1256 (2008). ("In a sense, everything a deeply devout person does has a religious purpose. But if that formulation determined the exemption from property taxes, religious identity would effectively be the sole criterion. A church could open a restaurant, for instance, and because waiters attempted to evangelize customers while taking their orders, the restaurant would be exempt.").

In holding that a building had been used solely and exclusively for religious activities, our Supreme Court in *Cogswell* pointed out that the building had not been used for any "political action" or activities which would have caused it to lose its tax exempt status: "We hasten to add, on the record here presented, there is nothing to show that any part of the use of the building in the administration of the Conference activities embraced political action or activities which would remove the property from its tax exempt status." *Cogswell,* 205 Kan. at 861. As a result, our Supreme Court has determined that political action or activities are not considered a religious activity.

Although we accept WBC's contention that its picketing activities represent its sincerely held religious beliefs, we determine that its political activities and secular philosophy, which constitute a significant part of its picketing activities, preclude a tax exemption for its 2002 Ford F-150 truck. In short, we determine that the picketing activities in use of the truck do not fit within the exemption for exclusively religious purposes under K.S.A. 79-201 *Second.* Moreover, we determine that the picketing activities in use of the truck do not fit within the exemption for use of property for a nonexempt purpose when the use is minimal in scope and insubstantial in nature under subsection (c) of K.S.A. 79-201 *Second.* As a result, we determine that BOTA properly denied the tax exemption for the truck.

We have considered the other issues presented by WBC and determine that they lack merit.

Affirmed.