RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0062p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

TEEN RANCH, INC., MATTHEW KOCH, and MITCHELL
KOSTER,

> *Plaintiffs-Appellants,*

*v.*

MARIANNE UDOW, MUSETTE MICHAEL, and
DEBORA BUCHANAN,

> *Defendants-Appellees.*

No. 05-2371

---

Appeal from the United States District Court
for the Western District of Michigan at Lansing.
No. 04-00032—Robert Holmes Bell, Chief District Judge.

Argued: October 25, 2006

Decided and Filed: January 17, 2007[*]

Before: KEITH and COLE, Circuit Judges; STEEH, District Judge.[**]

---

## COUNSEL

**ARGUED:** Joel L. Oster, ALLIANCE DEFENSE FUND, Leawood, Kansas, for Appellants. Joel
D. McGormley, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL, Lansing, Michigan,
for Appellees. **ON BRIEF:** Joel L. Oster, Kevin H. Theriot, ALLIANCE DEFENSE FUND,
Leawood, Kansas, Gary McCaleb, ALLIANCE DEFENSE FUND, Scottsdale, Arizona, for
Appellants. Joel D. McGormley, MICHIGAN DEPARTMENT OF ATTORNEY GENERAL,
Lansing, Michigan, for Appellees. Daniel Mach, AMERICAN CIVIL LIBERTIES UNION,
Washington, D.C., Kary L. Moss, AMERICAN CIVIL LIBERTIES UNION, Detroit, Michigan,
David S. Prohofsy, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, Chicago, Illinois, for Amici
Curiae.

---

[*]This decision was originally issued as an "unpublished decision" filed on January 17, 2007. On January 31,
2007, the court designated the opinion as one recommended for full-text publication.

[**]The Honorable George Caram Steeh, United States District Judge for the Eastern District of Michigan, sitting
by designation.

---

**OPINION**

---

DAMON J. KEITH, Circuit Judge.  Plaintiffs-Appellants, collectively referred to as "Teen Ranch,"[1] appeal the district court's grant of summary judgement in favor of Defendants-Appellees, collectively referred to as the Family Independence Agency ("FIA"),[2] on Teen Ranch's constitutional and statutory religious discrimination claims.  For the following reasons, we **AFFIRM** the district court's grant of summary judgement.

**I**.

The FIA, a department of the Michigan state government, is responsible for providing care and supervision to abused, neglected, and delinquent children who have been committed to or placed in its care through state courts.  The FIA is authorized to contract with private organizations to provide placement services.  The FIA contracts with 96 private child-care agencies to provide residential services to youth for stays averaging four to twelve months.  At least 35 of the providers are faith-based organizations.

Once a child is placed in the care of the FIA, a computerized grid is then used to determine the best placement for the child.  The computer system considers the child's history, family history, any relevant psychological or psychiatric information, and other information identifying the child's treatment needs.  The computer then selects a service provider that best matches the child's needs.

Teen Ranch, one of the 35 faith-based providers that contract with the FIA, is an organization that has provided licensed and residential services for delinquent, neglected, abused, and emotionally troubled youth between the ages of 11 and 17 since 1966.  Teen Ranch has openly advertised its religious orientation, and has admittedly incorporated religious programming into the services it provides under the FIA contract.  However, Teen Ranch maintains that participation in the religious programming is voluntary since its policy does not mandate participation in any religious activity, including church services.  Specifically, its program involves voluntary prayers before meals, voluntary devotions during the week, voluntary church attendance, and voluntary discussions concerning the Christian faith between staff and the children.

Between October and November of 2003, the FIA conducted a "Quality Assurance Review" ("QAR") of the Teen Ranch program.  The QAR unveiled several areas of contract and policy noncompliance.  Therefore, on November 6, 2003, the FIA, through Debora Buchanan ("Buchanan"), sent a letter to Teen Ranch outlining "violations of particular significance" and issuing a moratorium on further placements at Teen Ranch.  The QAR also uncovered evidence, which was later confirmed, in the form of youth reports, interviews with residents, and Teen Ranch's brochure, that Teen Ranch coerced children into participating in religious activities. Thereafter, Teen Ranch's incorporation of religious practices into its programming became the FIA's chief concern.

On December 2, 2003, the FIA issued a "Quality Assurance Program Review Report" to Teen Ranch and requested, within 30 days, a "Quality Improvement Plan" addressing all of their concerns.  Teen Ranch subsequently submitted a "Corrective Action Plan" ("CAP" or "plan"), and

---

[1] Plaintiffs-Appellants are Teen Ranch, Inc.; Matthew Koch, its Chief Executive Officer; and Mitchell Koster, its Chief Operating Officer.

[2] Defendants-Appellees are Marianne Udow, Director of the FIA; Musette Michael, Interim Director of the FIA; and Debora Buchanan, Manager of the Purchased Care Division of the FIA.

on December 16, 2003, Buchanan sent a letter responding to Teen Ranch's plan. In addition to detailing the areas of Teen Ranch's CAP that did not adequately ensure compliance, the letter also addressed Teen Ranch's representation that youth are not required to participate in religious programming. Buchanan stated, "It is not only improper to force youth to participate in religious practices, but it is also improper to incorporate religious teachings into the on-going daily activities of youth and their treatment plans." (J.A. at 251). On December 17, 2003, a meeting was held between the FIA and Teen Ranch where Teen Ranch continued to maintain its position of incorporating its religious beliefs into treatment programming. At the conclusion of that meeting, and in response to the FIA's request for an amended CAP concerning the religious practices, Teen Ranch issued the following statement, in pertinent part:

> The mission statement of Teen Ranch states, "*providing hope to young people and families through life changing relationships and experiences from a Christian perspective*." This mission, and our interpretation of this mission, will not change, be sacrificed, nor will it be compromised.

> Teen Ranch, as policy, does not "force" youth to attend religious services, although it is encouraged and we believe to be part of an effective treatment program. Alternatives are provided for the children who wish not to attend religious services, such as a personal academic study time (if desired), letter writing home [sic], recreational time in the gymnasium, or watch [sic] television until the other youth return home.

> However, incorporating religious teachings into on-going daily activities of youth and their treatment plans touches at the core of why we were founded, why we are here today, and why we will continue to include such programming for children in our care.

(J.A. at 640) (emphasis in original).

By early January 2004, Teen Ranch had submitted an amended CAP that addressed all of the violations identified by the FIA, with the exception of the incorporation of religious practices in its programming. Accordingly, on January 9, 2004, the FIA informed Teen Ranch, by letter, that while it supports the important role that faith-based organizations play in providing quality services to Michigan youth and families, "providers receiving federal funding may not incorporate sectarian worship, instruction, or proselytization into the daily treatment and service plan activities." (J.A. at 252). Furthermore, it stated that "[t]he incorporation of faith specific tenets into treatment is not permitted by state and federal law[,]" and "if Teen Ranch is unwilling to modify its current practices regarding the imposition of its religious beliefs into the daily treatment and service plan activities, [the] FIA is unable to approve the corrective action plan and rescind the moratorium." (J.A. at 252).

On January 21, 2004, Teen Ranch, submitting federal and state law that purportedly supports its claim, issued a letter detailing its position and denying allegations of coerced religious participation. On January 30, 2004, the FIA and Teen Ranch met again but to no avail. The parties continued their discussion; however, a solution regarding the incorporation of religious programming was not reached. Ultimately, on February 20, 2004, Teen Ranch filed suit pursuant to 42 U.S.C. § 1983, alleging violations of: (1) the Free Exercise Clause of the First Amendment; (2) the Free Speech Clause of the First Amendment; (3) the Due Process Clause of the Fourteenth Amendment; (4) the Equal Protection Clause of the Fourteenth Amendment; and (5) 42 U.S.C. § 604a.

On February 23, 2004, Teen Ranch moved for a temporary restraining order, which was denied on the same day. Thereafter, Teen Ranch moved for a preliminary injunction. At the advice of counsel, the FIA briefly lifted the moratorium to prepare for the preliminary injunction hearing.

On April 1, 2004, the district court denied Teen Ranch's preliminary injunction motion. Upon the denial of the motion, the FIA reinstated the full moratorium. On February 17, 2005, both parties filed cross-motions for summary judgment. On September 29, 2005, the district court issued an opinion granting summary judgment in favor of the FIA. Teen Ranch timely filed the present appeal.

## II.

We review *de novo* a district court's grant of summary judgment. *May v. Franklin County Comm'rs*, 437 F.3d 579, 583 (6th Cir. 2006).

The district court properly considered Teen Ranch's constitutional and statutory claims, and correctly granted judgement in favor of the FIA. As a preliminary matter, the district court identified the applicable law at issue — § 220 of the Michigan State Appropriations Bill, 2003 P.A. 172 ("Public Act")[3] — which governs contracts between the FIA and faith-based organizations and also instructs the FIA to follow the guidelines set forth in 42 U.S.C. § 604a,[4] the federal statute that

---

[3] In full, section 220 provides:

> 1) In contracting with faith-based organizations for mentoring or supportive services, and in all contracts for services, the department shall ensure that no funds provided directly to institutions or organizations to provide services and administer programs shall be used or expended for any sectarian activity, including sectarian worship, instruction, or proselytization.

> (2) If an individual requests the service and has an objection to the religious character of the institution or organization from which the individual receives or would receive services or assistance, the department shall provide the individual within a reasonable time after the date of the objection with assistance or services and which are substantially the same as the service the individual would have received from the organization.

> (3) The department shall ensure that faith-based organizations are able to apply and compete for services, programs, or contracts that they are qualified and suitable to fulfill. The department shall not disqualify faith-based organizations solely on the basis of the religious nature of their organization or their guiding principles or statements of faith.

> (4) The department shall follow guidelines related to faith-based involvement established in section 104 of title I of the personal responsibility and work opportunity reconciliation act of 1996, Public Law 104-193, 42 U.S.C. § 604a.

2003 Mich. Pub. Acts 775.

[4] In pertinent part, 42 U.S.C. § 604a provides that:

> (b) . . . The purpose of this section is to allow States to contract with religious organizations . . . on the same basis as any other nongovernmental provider without impairing the religious character of such organizations, and without diminishing the religious freedom of beneficiaries of assistance funded under such program.

> (c) . . . In the event a State exercises its authority . . . religious organizations are eligible, on the same basis as any other private organization . . . so long as the programs are implemented consistent with the Establishment Clause of the United States Constitution. . . .

> (e) . . . (1) . . . If an individual . . . has an objection to the religious character of the organization or institution from which the individual receives, or would receive, assistance . . . the State in which the individual resides shall provide such individual (if otherwise eligible for such assistance) within a reasonable period of time after the date of such objection with assistance from an alternative provider that is accessible to the individual and the value of which is not less than the value of the assistance which the individual would have received from such organization. . . .

governs contracts between states and charitable, religious or private organizations. The district court properly recognized that this case turns on whether the FIA's funding of Teen Ranch is indirect, rather than direct, because the funding is "a result of the genuine and independent choices of private individuals." *Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002); *see also Mitchell v. Helms*, 530 U.S. 793, 810 (2000) (Supreme Court stating that it has "repeatedly considered whether any governmental aid that goes to a religious institution does so 'only as a result of the genuinely independent and private choices of individuals[]'" rather than "the unmediated will of government.") (quoting *Agostini v. Felton*, 521 U.S. 203, 226 (1997)).[5] Accordingly, the district court examined "whether the ability of youth to opt out of the Teen Ranch program pursuant to § 220(2) of the Public Act based on its religious character gives the youth true private choice so as to make the funding of the religious programs at Teen Ranch indirect rather than direct." *Teen Ranch v. Udow*, 389 F. Supp. 2d 827, 834-35 (W.D. Mich. 2005).

After a thorough analysis, the district court concluded that the opt out provision of § 220(2) of the Public Act did not equate to a "true private choice," since "the State selects the [youth's] residential placement, . . . [and the youth's] ability to opt out of placement at a faith-based institution with religious programming is not sufficient to avoid Establishment Clause problems because State placements at Teen Ranch would advance or endorse a particular religious viewpoint." *Id.* at 836. Therefore, since the opt out provision does not give youth "true private choice," the district court held that "the State cannot fund placements at Teen Ranch [given its religious programming] without running afoul of the Public Act and the Establishment Clause." *Id.* at 837; *see also Mitchell*, 530 U.S. at 816-17 (holding that "[a]ny money that ultimately went to religious institutions . . . as a result of the genuinely independent and private choices of individuals" is valid. (internal quotations and citation omitted)). In addition, the district court properly regarded the youth and vulnerability of the class of citizens at issue here as a relevant consideration. *See*, *e.g.*, *Lee v. Weisman*, 505 U.S. 577, 592 (1992) ("As we have observed before, there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools.") (citing *School Dist. of Abington v. Schempp*, 374 U.S. 203, 307, (1963) (Goldberg, J., concurring); *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987); *Board of Ed. of Westside Community Schools (Dist. 66) v. Mergens*, 496 U.S. 226, 261-262 (1990) (Kennedy, J., concurring).

Following the determination that § 220(2) of the Public Act did not provide a "true private choice," the district court proceeded to address Teen Ranch's five claims. Rejecting Teen Ranch's Free Exercise Clause claim, the district court distinguished *Sherbert v. Verner*, 374 U.S. 398 (1963), and the line of cases following *Sherbert*, which held that the government could not deny a public benefit based on a worker's religious beliefs, and concluded that "[u]nlike unemployment benefits or the ability to hold office, a state contract for youth residential services is not a public benefit." *Teen Ranch*, 389 F. Supp. 2d at 838. In addition, relying on *Locke v. Davey*, 540 U.S. 712 (2004), which held that a state scholarship program that excluded students pursuing degrees in theology did

---

(i) . . . Any party which seeks to enforce its rights under this section may assert a civil action for injunctive relief exclusively in an appropriate State court against the entity or agency that allegedly commits such violation.

(j) . . . No funds provided directly to institutions or organizations to provide services and administer programs . . . shall be expended for sectarian worship, instruction, or proselytization.

[5] "For if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment." *Mitchell*, 530 U.S. at 810.

not violate the Free Exercise Clause, the district court concluded that the FIA's failure to fund Teen Ranch's religious programming does not violate Teen Ranch's free exercise rights. *Id.*

Turning to Teen Ranch's free speech claim, the district court held that the FIA's decision to contract out its child services did not create a forum for private speech since "[t]he purpose of contracting for these services is to provide treatment for troubled youth in a residential setting, not to promote the private speech of the providers of that care." *Id.* at 840. As to the due process claim, the district court disagreed with Teen Ranch because the FIA instituted the moratorium according to the standards set forth in the Public Act which "guide the FIA regarding contracts with faith-based organizations and restricts the FIA from directly funding sectarian activities." *Id.* Likewise, the district court rejected Teen Ranch's equal protection claim because there was no evidence of a similarly-situated private placement facility that "incorporate[d] religion as an integral part of its residential program." *Id.* at 841. The district court further explained that, even if Teen Ranch was similarly-situated, the FIA's "desire to avoid violating the Establishment Clause . . . is sufficient to meet the rational basis test." *Id.*

In denying Teen Ranch's fifth and final claim under 42 U.S.C. § 604a, the district court, citing § 604a(i), noted that the statute does not create any private rights enforceable in federal court. The district court also recognized that § 604a applies only to programs funded under Titles I, II, and IV-A of the Social Security Act, and the "FIA is funded for a portion of its foster care placement costs under Title-IV-E . . . rather than Title IV-A." *Id.* at 841-42. Also, under its fifth claim, Teen Ranch alleged to have made a state law claim under § 220 of the Public Act. However, the district court found insufficient evidence to support this allegation, and to the extent a state claim was alleged, the district "[c]ourt decline[d] to exercise supplement[al] jurisdiction . . . because the [c]ourt had dismissed all of the federal claims over which it had original jurisdiction." *Id.* at 842.

After thoroughly reviewing the record, we believe that the district court was correct in reaching its conclusions and granting summary judgment in favor of the FIA. For the same reasons identified by the district court, we conclude that the opt out provision of the Public Act did not provide the children placed in the care of the FIA with "true private choice." Likewise, after carefully considering the applicable law, we also reject all five of Teen Ranch's arguments for the reasons articulated by the district court. The district court's opinion was sound, as it clearly articulated and provided the reasoning for rejecting Teen Ranch's constitutional claims.

While we are satisfied with affirming on the basis of the district court's well-considered opinion, we will take this opportunity to further consider the viability of Teen Ranch's fifth claim — a § 1983 action alleging violation of rights under 42 U.S.C. § 604a, a federal statute which provides a specific remedy that requires "[a]ny party which seeks to enforce its rights . . . may assert a civil action for injunctive relief exclusively in an appropriate State court against the entity or agency that allegedly commits such violation." 42 U.S.C. § 604a(i). The district court, understandably, did not address this issue. However, we believe it warrants consideration since both Teen Ranch and the FIA dedicate considerable efforts to this claim.

It is settled that "[42 U.S.C.] § 1983 is available as a remedy for violations of federal statutes as well as for constitutional violations." *Suter v. Artist M.*, 503 U.S. 347, 355 (1992) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)). However, "§ 1983 does not provide an avenue for relief every time a state actor violates a federal law." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). For example, "§ 1983 is not available to enforce a violation of a federal statute 'where Congress has foreclosed such enforcement of the statute in the enactment itself and where the statute did not create enforceable rights, privileges, or immunities within the meaning of § 1983.'" *Suter*, 503 U.S. at 355-56 (quoting *Wright v. Roanoke Redev. & Hous. Auth.*, 479 U.S. 418, 423 (1987)).

"Accordingly, to sustain a § 1983 action, the plaintiff must demonstrate that the federal statute creates an individually enforceable right in the class of beneficiaries to which he belongs." *Abrams*, 544 U.S. at 120. "Even after this showing, . . . [t]he defendant may defeat this presumption by demonstrating that Congress did not intend that remedy for a newly created right." *Id*. "[C]ongressional intent may be found directly in the statute creating the right, or inferred from the statute's creation of a 'comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" *Id*. (quoting *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). Moreover, "[t]he provision of an express, private means of redress in the statute itself is ordinarily an indication that Congress did not intend to leave open a more expansive remedy under § 1983." *Id*. at 121. However, "[t]he ordinary inference that the remedy provided in the statute is exclusive can surely be overcome by textual indication, express or implicit, that the remedy is to complement, rather than supplant, § 1983." *Id*. at 122. The party seeking to enforce the federal statutory right bears the burden of demonstrating that Congress intended to create the private federal remedy sought. *Suter*, 503 U.S. at 363-64.

In the instant matter, 42 U.S.C. § 604a(i) expressly provides that a plaintiff's remedy under § 604a resides exclusively in state court. As such, we must conclude that "Congress did not intend to leave open a more expansive remedy under § 1983." *Abrams*, 544 U.S. at 121. As noted in *Abrams*, "'the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.'" *Id*. (quoting *Alexander v. Sandoval*, 532 U.S. 275, 290 (2001)). Likewise, 42 U.S.C. § 604a does not provide a textual indication, express or implicit, that the remedy provided for in state court is complementary to the remedies available under § 1983. Teen Ranch has failed to provide, as it must, any evidence indicating that § 604a(i) was not intended to foreclose or supplant the available remedies under § 1983. Accordingly, Teen Ranch's rights under 42 U.S.C. § 604a may be enforced only in state court; thus, a cause of action under this federal statute is not cognizable in federal court.

## III.

Accordingly, for the reasons stated in the district court's well-considered opinion and the additional reasons provided herein, we **AFFIRM** the district court's grant of summary judgment in favor of the FIA.