NOT DESIGNATED FOR PUBLICATION

Nos. 115,945
115,946

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
R.M., YOB 2011, a Male, and
R.B., YOB 2012, a Female.

MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Opinion filed May 12, 2017. Affirmed.

*Daniel C. Walter*, of Walter & Walter LLC, of Norton, for appellant natural mother.

*Charlene Burbaker*, county attorney, for appellee.

*Paul R. Oller*, of The Oller Law Firm, LLC, of Hays, for appellee maternal grandmother.

Before GREEN, P.J., STANDRIDGE and GARDNER, JJ.

GARDNER, J.: Mother appeals from the termination of her parental rights to her two children. She contends that the procedure violated her First Amendment rights under the Establishment Clause, violated her constitutional due process right to raise her children, and discriminated against her based on her sexual orientation. We find no merit to these arguments, but we find clear and convincing evidence supporting the termination of Mother's parental rights. Accordingly, we affirm.

1

*Factual and Procedural Background*

Mother has two children, R.M., a son, and R.B., a daughter. The events that led to this appeal occurred in 2013 when her son was 2 years old and her daughter was 10 months old. Mother and her children were living with Mother's same-sex partner, J.B., at the time.

On June 17, 2013, Mother went to work around noon and left the children in the care of her partner. Her son was then injured. Mother's partner claimed that she had taken the son to his room and had left him alone while she tried to put the daughter down for a nap. While tending to the daughter, Mother's partner heard a loud noise in the son's room. She checked on the boy and could tell that his leg was injured, so she took the boy to Hays Medical Center. She claimed that the boy had injured himself by playing on a broken loveseat.

The son had multiple injuries, including a broken lower left leg and bruising on his forehead, left ear, buttocks, penis, scrotum, and groin. His penis was swollen and its tip was red and scabbed over. Mother told investigators that her son had not had any injuries to his genital area when she changed his diaper before going to work. A pediatrician who examined him testified that the injuries to his genitals could have happened only through blunt-force trauma. The pediatrician also testified that it was "hard to think of an accident that would cause the entire pattern of injuries for sure." The pediatrician plainly stated that the injuries the son received were consistent with child abuse.

Neither Mother nor her partner could provide any explanation for the son's injuries other than the alleged accident involving the loveseat. The treating physician acknowledged that the boy's injuries were not all consistent with a fall from a loveseat, and Mother and her partner stated they never spanked him as a form of punishment.

2

A nurse at Hays Medical Center alerted local law enforcement that the boy's injuries may have been the result of child abuse. Investigator Aaron Larson spoke to Mother, her partner, and the medical professionals involved. He found reasonable grounds to believe that the children would be harmed unless they were placed in immediate custody elsewhere. Investigator Larson based his conclusion on the following facts: (1) The boy had a broken leg; (2) his injury occurred in the home that the children shared with Mother and her partner; (3) the partner stated that the boy had broken his leg while climbing on and falling from a broken loveseat; (4) the boy had bumps and scrapes on his body; (5) medical staff informed the officers that he had bruises on his ear and scratches under his chin and on his neck; (6) the boy had injuries to his head which were not consistent with the incident as described by Mother's partner; and (7) the boy had significant injuries to his groin and buttocks which were not consistent with the incident as described by Mother's partner.

Investigator Larson's report found inadequate explanations by Mother and her partner as to the cause of the injuries:

> "When confronted with the groin injuries, [Mother] told officers that she had changed [her son's] diaper prior to noon and had not seen those injuries or a bruise to [his] buttocks. Officers noted that [the son] was dirty while [the daughter] was clean and smelled like she had been washed recently. [Mother's partner] stated that she did not know how the injuries happened to [the boy]. Some of the injuries to [him] could not have been caused by him playing on the loveseat, especially the injuries to the groin. There was generalized bruising in that area that was purple and red. The end of the penis was bright red in color.
> "Due to the nature of the injuries and the lack of an adequate expl[a]nation by either of the caregivers, officers placed [the boy] and his sister, [R.B.,] into police protective custody, to assure their safety. [The boy] will remain under medical care for the time being, and placement will be determined for [his sister]."

3

That same day, a detective with the Hays Police Department interviewed Mother's partner. When shown photographs of the boy's injuries, she said that she was "disgusted." Eventually, she was arrested and was criminally charged with felony child abuse of Mother's son. She ultimately made an *Alford* plea to three misdemeanor counts of child endangerment. She thus pleaded guilty to the charges without admitting to the commission of the offenses. See *State v. Case*, 289 Kan. 457, 460, 213 P.3d 429 (2009). The district court in Mother's subsequent termination of parental rights case took judicial notice of the arrest, charge, and criminal convictions of Mother's partner.

The detective later spoke with Mother, who indicated that she could not believe her partner would have injured her son. Mother has chosen to persist in her disbelief throughout these proceedings.

Two days later, a petition was filed pursuant to K.S.A. 2012 Supp. 38-2234 alleging that both children were in need of care. The State also filed and the district court granted an Application for Ex Parte Order of Protective Custody under K.S.A. 2012 Supp. 38-2242, finding that an emergency existed in the home which threatened the children's safety. A temporary custody hearing soon followed, and the children were adjudicated as children in need of care and were placed in the custody of the Secretary of the Department for Children and Families (DCF).

Initially, both children were placed in the care of a foster home licensed by Saint Francis Community Services (Saint Francis) because it had held medically fragile children before. The children stayed there for about 2 months; but once the son's injuries healed, the children's activity level increased such that the caregiver stated she could not effectively care for them. Accordingly, in August 2013, both children were placed with their maternal grandmother and stepgrandfather.

4

In July 2013, at the parties' first case planning conference, the permanency goal was listed as reintegration with Mother. Every case planning conference mandated that Mother should have no contact with her partner and that the partner should have no contact with the children. Reintegration remained the goal until November 2014.

In April 2015, the State moved the court to find Mother unfit and to terminate her parental rights. Mother responded in June 2015 by filing a motion to dismiss, arguing the following: (1) her freedom of religion was being violated; (2) her due process rights to raise her children were being violated; (3) her due process rights were being violated because DCF had already "essentially" terminated her parental rights by halting visits; (4) she was being discriminated against based on her sexual orientation, citing K.S.A. 44-1001 and 44-1009; and (5) the district court violated K.S.A. 2013 Supp. 38-2264(e) by failing to hold a permanency hearing within 30 days of the November 19, 2014, review hearing at which the court determined reintegration was no longer viable.

Soon thereafter, Mother filed an amended motion to dismiss which added this claim: "By relinquishing its authority to Saint Francis Community Services, the State of Kansas is allowing a religious based organization to establish its principles upon this family in violation of the First Amendment to the United States Constitution."

On September 23, 24, and 25, 2015, a trial was held on the State's motion to terminate Mother's parental rights and on Mother's motions to dismiss. The district court's written decision found: "Regarding the constitutional arguments, no evidence was offered nor did counsel for the biological mother articulate how these fundamental rights were violated and the court is left to speculate. It appears these relate to the same-sex relationship . . . ." Thus, the court denied Mother's motions to dismiss. The court then found "by clear and convincing evidence that [Mother] is unfit by reason of conduct which renders her unable to care properly for her children and that conduct is unlikely to

5

change in the foreseeable future." The court terminated Mother's parental rights as to both children.

The court's subsequent journal entry states the following facts: (1) R.M. was physically abused by J.B., who was Mother's partner; (2) his injuries "were horrible and included significant bruising and swelling of the penis; bruising of the groin, buttocks, left mid leg, face, forehead and ear with significant bruising of the inner ear; a fracture of the tibia; and other injuries"; (3) medical witnesses testified that the injuries were not accidental and were instead the result of blunt-force trauma; (4) during a videotaped interview, Mother's partner was shown pictures of the injuries and acknowledged the seriousness of the boy's injuries; (5) a child in need of care case was initiated as a result of the abuse to the boy; (6) Mother repeatedly violated the provision of her reintegration plans by maintaining contact with her partner; (7) Mother failed to attend therapy as required and was inconsistent in her visits with her children; she also failed to take responsibility for her actions and did not comply with the requirements of her case plan; (8) the children's therapist recommended that Mother's visits with the children be suspended because Mother had failed to take the necessary steps for reunification and was unable to meet the safety and security needs of the children; (9) Mother had not seen her children since either March or May 2014; and (10) Mother "consistently refused to accept that J.B. physically abused [her son]. She testified that J.B. had not done anything wrong and that nothing would change her mind about that opinion. She further stated that if the children were returned to her, she would re-introduce the children with J.B."

On May 18, 2016, the court entered a posttermination journal entry which acknowledged that the parental rights of R.M.'s father had been terminated on September 5, 2014; the parental rights of R.B.'s father had been terminated on June 10, 2015; and Mother's parental rights had been terminated as to both children on September 24, 2015. Mother timely appealed.

6

I. *Does this court have jurisdiction to hear the appeal?*

We first address the State's and Grandmother's arguments that this court lacks jurisdiction to hear Mother's appeal.

The State argues that we lack jurisdiction to hear this appeal because Mother "raises no issue questioning the adequacy of the evidence from which the court concluded she is unfit and her parental rights should be terminated, nor did she brief the same." The State argues that "[s]he has de facto appealed . . . the court's denial of her motion and amended motion to dismiss, which is not an appealable order." Thus, the State asserts that Mother has abandoned any issue related to the actual termination of her parental rights and the "appeal must be dismissed for lack of jurisdiction." Grandmother makes a similar argument.

"The right to appeal is entirely statutory and is not contained in the United States or Kansas Constitutions. Subject to certain exceptions, Kansas appellate courts have jurisdiction to entertain an appeal only if the appeal is taken in the manner prescribed by statute." *Butler County R.W.D. No.8 v. Yates*, 275 Kan. 291, 299, 64 P.3d 357 (2003). The statute relating to an appeal from a termination of parental rights provides: "An appeal may be taken by any party or interested party from any order of temporary custody, adjudication, disposition, finding of unfitness or termination of parental rights." K.S.A. 2016 Supp. 38-2273(a). "If an order in a child in need of care case does not fit within these five categories, it is not appealable." *In re N.A.C.*, 299 Kan. 1100, Syl. ¶ 3, 329 P.3d 458 (2014).

The State and Grandmother rely on *In re D.I.G.*, 34 Kan. App. 2d 34, 114 P.3d 173 (2005). In that case, however, the father made no challenge on appeal to the termination of his parental rights and challenged only the earlier temporary custody order. The court deemed any issue regarding the termination of his parental rights

7

abandoned because it had not been briefed and found that the father had not timely appealed the temporary custody order and had not designated that order in his notice of appeal. Accordingly, the court dismissed the father's appeal for lack of jurisdiction. 34 Kan. App. 2d at 36.

This case is unlike *D.I.G.* in that Mother has timely appealed from a termination of her parental rights. True, the arguments she makes on appeal were presented to the district court in a motion to dismiss, and caselaw unequivocally states that the denial of a motion to dismiss is not an appealable decision. See S*tate v. Webb*, 52 Kan. App. 2d 891, 897-98, 378 P.3d 1107 (2016), *petition for rev. filed* August 22, 2016. But those same issues were argued on the first day of the termination of parental rights trial and in Mother's posttrial brief to the district court. They were, in essence, her defense to the State's motion to terminate her parental rights. The district court denied Mother's motions to dismiss at trial and journalized that denial in its April 2016 journal entry. Mother has appealed from "the decision of the Court dated March 21, 2016, terminating her parental rights and Journal Entry filed April 21, 2016." Accordingly, Mother has timely appealed the termination of her parental rights as well as the denial of her motions to dismiss.

Mother's arguments were presented as a part of the proceedings at which her parental rights were terminated. The substance of Mother's arguments challenges the temporary custody of the children with Saint Francis and eventually the termination of Mother's parental rights. Indeed, Mother seeks the remedy of having her children returned to her care. Although she does not directly challenge the quantum of proof, she raises constitutional and other reasons challenging the termination of her parental rights. This is the proper time and forum in which to do so.

We also understand the appellees' suggestion of mootness; but we find Mother's issues on appeal are not moot, as she has challenged the district court's ultimate findings in support of terminating her parental rights. Compare *In re N.A.K.*, No. 103,188, 2010

8

WL 1610451, at *1 (Kan. App. 2010) (unpublished opinion) (finding the issue of investigation by law enforcement and consideration of allegations by a district or county attorney to support the institution of the child in need of care proceeding moot because parents did not challenge the ultimate termination of their parental rights).

Accordingly, we find that we have jurisdiction to hear Mother's arguments on appeal. We address in Section V of this opinion whether Mother has abandoned her challenge to the facts supporting the termination of her parental rights by not briefing that issue.

II. *Were Mother's First Amendment rights under the Establishment Clause violated?*

Mother argues that "[b]y relinquishing its authority to Saint Francis Community Services, the State of Kansas is allowing a religious based organization to establish its principles upon this family in violation of the First Amendment to the United States Constitution."

Whether an individual's constitutional rights have been violated is a question of law over which an appellate court has unlimited review. *Johnson v. State*, 289 Kan. 642, 649, 215 P.3d 575 (2009).

The First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The guarantee of religious freedom consists of two parts: (1) the Establishment Clause and (2) the Free Exercise Clause. *Purdum v. Purdum*, 48 Kan. App. 2d 938, 943-44, 301 P.3d 718 (2013).

Mother advances only an Establishment Clause claim on appeal. This clause exists to prevent the states from "sponsorship, financial support, and active involvement . . . in

religious activity." *Walz v. Tax Commission of New York*, 397 U.S. 664, 668, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). But the Establishment Clause does not mandate absolute separation between church and state. *Walz*, 397 U.S. at 670. Instead, the Clause mandates "official neutrality in religious disputes, which the United States Supreme Court has characterized as one of 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.'" *Purdum*, 48 Kan. App. 2d at 944 (quoting *Walz*, 397 U.S. at 669). We have recognized that "[s]ome relationship between government and religious organizations is inevitable." *In re Tax Exemption Application of Westboro Baptist Church*, 40 Kan. App. 2d 27, 44, 189 P.3d 535 (2008). A more distant relationship may be appropriate when the subjects of the alleged violation are children. See *Lee v. Weisman*, 505 U.S. 577, 592, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992) (noting the "heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools").

Although the Kansas Supreme Court has not decided Establishment Clause questions, the United States Supreme Court has often addressed them. In the context of public education, which we find analogous here, it has used three different tests to evaluate state actions challenged on Establishment Clause grounds: the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 612-13, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971), summarized below; the "endorsement" test of *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 592-94, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989); and the "coercion" test of *Lee*, 505 U.S. at 592-96. See *Tangipahoa Parish Bd. of Educ. v. Freiler*, 530 U.S. 1251, 1252, 120 S. Ct. 2706, 2707, 147 L. Ed. 2d 974 (2000) (order, *cert. denied*) (Scalia, J., dissenting).

Our court has traditionally applied *Lemon*'s "much-maligned, though exceptionally durable" test. *Robertson v. Call*, No. 112,132, 2015 WL 326677, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 301 Kan. 1047 (2015). See *Purdum*, 48 Kan. App. 2d at 948; *In re Westboro Baptist Church*, 40 Kan. App. 2d at 44. We do so here as well.

10

Under that three-pronged test, we determine whether State action has violated the Establishment Clause by determining first, whether the statute has a secular legislative purpose; second, whether its principal or primary effect advances religion; and third, whether the statute fosters an excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13.

The record shows that the son's abuse by Mother's partner occurred on June 17, 2013, and the children were placed by Saint Francis with a family for approximately 9 weeks while his broken leg healed. But by August 23, 2013, both children were residing with their maternal grandmother, where they remain.

Mother argues that the State violated her rights under the Establishment Clause by contracting with Saint Francis, an Episcopalian organization, to provide childcare services on behalf of the State. She contends that "[b]y relinquishing its authority to Saint Francis Community Services, the State of Kansas is allowing a religious based organization to establish its principles upon this family." In support, Mother contends that Saint Francis' website "indicates that the imposition of Christian religious principles are being forced upon people such as [Mother]." But no citation to the record is made and no part of that website is included in Mother's brief; thus, this conclusory assertion is unsupported by fact.

Mother has shown no evidence that Saint Francis encouraged, let alone coerced, her children into participating in religious activities or conditioned their receipt of any benefits on such participation. None of the case plans or court orders contains any reference to religious acts or beliefs or requires Mother or her children to do anything of a religious nature. Mother has not shown anything of a religious nature in the homes her children have been placed in. Thus Mother's facts are not like those in the case she relies on, *Teen Ranch, Inc. v. Udow*, 479 F.3d 403 (6th Cir. 2007), *cert. denied* 552 U.S. 1039 (2007), where the group home at which the children were placed consistently led children

11

in religious activities. There, the court found the children's ability to opt out of religious activities conducted by the group home was not enough to avoid an Establishment Clause violation. 479 F.3d at 409-10. But the constitutional concerns in *Teen Ranch* are not present here.

Mother argues that the State's contract with Saint Francis violates Mother's rights under the Establishment Clause merely because Saint Francis is a faith-based organization. But Mother cites no legal support for this assertion. Mother's focus on the status, rather than on the acts, of Saint Francis is misplaced, as the Supreme Court has consistently rejected the premise that government conduct which in some manner aids an institution with a religious affiliation violates the Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 683, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (finding "'not every [practice] that confers an "indirect", "remote", or "incidental" benefit upon [religion] is, for that reason alone, constitutionally invalid.'"; *Mueller v. Allen*, 463 U.S. 388, 393, 103 S. Ct. 3062, 77 L. Ed. 2d 721 (1983) (noting Court's consistent rejection of the argument that "'any program which in some manner aids an institution with a religious affiliation' violates the Establishment Clause"); *Hunt v. McNair*, 413 U.S. 734, 742, 93 S. Ct. 2868, 37 L. Ed. 2d 923 (1973) (stating one fixed principle in this field is our consistent rejection of the argument that "any program which in some manner aids an institution with a religious affiliation" violates the Establishment Clause).

Application of the *Lemon* test to the facts of record confirms that Mother has not met her burden of showing that the State violated the Establishment Clause. First, the contract states that its purpose is "Family Preservation Services." No other purpose has been shown; thus, the contract between DCF and Saint Francis has a predominant secular purpose. Secondly, for government conduct "to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence." *Corporation of Presiding Bishop v. Amos*, 483 U.S. 327, 337, 107 S. Ct. 2862, 97 L. Ed. 2d 273 (1987). But no evidence suggests that the State or Saint

Francis has somehow promoted a religious message, as no evidence shows that Saint Francis in any way encouraged Mother or her children in any religious activities or views. Thus the State's contract has not been shown to have had the principal or primary effect of endorsing religion. Lastly, the contract does not result in any excessive entanglement between the State and religion. Mother has presented no evidence that Saint Francis has inserted any religion into the contractual relationship, and "[e]ntanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini v. Felton*, 521 U.S. 203, 233, 117 S. Ct. 1997, 138 L. Ed. 2d 391 (1997). Excessive entanglement requires more than mere interaction or administrative cooperation between church and state. Accordingly, we find no error in the district court's finding that Mother has shown no violation of her rights under the Establishment Clause.

Mother also asserts the same constitutional violations of her children's rights. Assuming, without deciding, that Mother has standing to assert such violations, we reach the same conclusions throughout this decision regarding their rights as we reach regarding Mother's rights.

III. *Was Mother's constitutional due process right to raise her children violated?*

Mother next argues that she was denied due process. As above, we review the district court's decision on this issue de novo. *Johnson*, 289 Kan. at 649.

When assessing a due process claim, Kansas courts take a two-step approach. We first determine whether the State has deprived the individual of life, liberty, or property. 289 Kan. at 649. If such a deprivation has occurred, we then determine the extent and nature of the process that is due. *Hogue v. Bruce*, 279 Kan. 848, 850-51, 113 P.3d 234 (2005).

13

Mother had a protected liberty interest in raising her children. "[T]he interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized" by the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). That liberty interest remains although a parent has lost temporary custody of a child:

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. . . . When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982).

Accordingly, we focus on whether the process Mother was given fell short of the process she was due. "Due process is not a static concept; rather, its requirements vary to assure the basic fairness of each particular action according to its circumstances." *In re J.L.D.*, 14 Kan.App.2d 487, 490, 794 P.2d 319 (2009), *disapproved on other grounds by In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 209 P.3d 200 (2009).

Mother argues that her parental rights were essentially terminated without due process in three ways: (1) Her permanency plans stated that there were to be mandatory child-parent visits once per week, but the State did not honor the visits; (2) "[t]he Court, DCF and Saint Francis . . . adopted as fact mere speculation that the children would have future contact with [Mother's partner] if they were returned to . . . [Mother]"; and (3) the trial judge partly based his decision to terminate on the fact that Mother continued to have contact with her partner, even though the judge had lifted a no-contact order during the reintegration process.

We are not persuaded by these arguments. First, the permanency plans' statements that there were to be weekly, mandatory child-parent visits appear to have been in error.

14

A Saint Francis employee testified that inclusion of mandatory weekly visitations in Mother's permanency plans was an oversight that should have been caught and corrected early in the reintegration plan. That testimony was not contradicted. Moreover, each case planning conference stated that visits would be at the discretion of Saint Francis.

Second, the record fails to support Mother's claim that the district court, DCF, and Saint Francis merely *speculated* that the children would have future contact with Mother's partner if they were returned to Mother. Mother's own trial testimony confirms the nonspeculative nature of that conclusion. Mother admitted that she had maintained contact with her partner throughout the reintegration process in violation of her case plans and that she would reintroduce that partner into the children's lives if she were granted custody. Mother consistently refused to accept that her partner had physically abused her son. She testified that her partner had not done anything wrong and that nothing would change her mind about that opinion.

Third, Mother complains that the trial judge focused on her continued contact with her partner, even though the judge had previously lifted a no-contact order between the two of them. But the no-contact order was apparently issued only in the criminal case against the partner arising out of her abuse of Mother's son. Although that order was apparently lifted in the criminal case after Mother's partner pleaded guilty, each and every case plan in the children's child in need of care case required Mother to have no contact with her partner. It was clearly communicated to Mother that a condition of her reintegration with her children was that she was to terminate her relationship with her son's abuser, yet she steadfastly refused to meet that condition. The trial judge was correct to consider that refusal.

Mother also alleges that her parental rights were "essentially terminated" when her visitation rights were suspended. We disagree. Her parental rights were terminated only after a 3-day trial that afforded her a full and fair opportunity in which to present her

15

case. Prior to her trial, visitation was suspended at times due to Mother's non-cooperation. For example, the March 2014 report states that Mother's visitation rights had been suspended because the son's therapist had determined that visits were no longer beneficial to the children since Mother was still in contact with her partner. The May 2014 report states Mother had missed her last visitation with the children. The August 2014 reports indicated Mother was uncooperative and had stated she no longer wanted visits with her children, and it concluded she was not actively seeking reintegration. Accordingly, we find no error in the district court's rejection of Mother's due process claims.

IV. *Did the State discriminate against Mother based on her sexual orientation?*

Mother next contends that the State discriminated against her by permitting St. Francis to consider her sexual orientation in its reintegration plan.

On appeal, Mother relies on the Equal Protection Clause and related cases, yet her motions to dismiss, which raised this issue before the district court, raised no constitutional issue as to sexual orientation. Instead, Mother cited only K.S.A. 44-1001 and K.S.A. 44-1009 of the Kansas Act Against Discrimination, yet made no attempt to apply those statutes to the facts of the case. Similarly, Mother's proposed findings of fact and conclusions of law submitted to the district court after her termination trial raised no constitutional issue as to sexual orientation. Her constitutional grounds for reversal are thus asserted for the first time on appeal.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). Although that rule has some exceptions, Supreme Court Rule 6.02(a)(5) (2017 Kan. S. Ct. R. 34) requires an appellant to explain why an issue not raised below should be considered for the first time on appeal. Mother makes no attempt

16

to comply with that rule, and we have been tasked to strictly enforce it. *Godfrey*, 301 Kan. at 1043-44. Thus, Mother's constitutional claim of discrimination is not preserved for appellate review.

V. *Was the termination of Mother's parental rights supported by clear and convincing evidence?*

*Has Mother waived this issue?*

We next discuss the State's argument that Mother has not challenged the district court's factual basis for the termination of her parental rights. Instead, Mother has argued nearly exclusively the theories from her motions to dismiss. In the conclusion of her brief, however, Mother asserts "[i]t was not shown by clear and convincing evidence that the Natural Mother-Appellant was unfit and could not be successfully reintegrated with her children."

An issue not briefed by an appellant is deemed waived or abandoned. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011); see *In re D.I.G.*, 34 Kan. App. 2d 34, 35, 114 P.3d 173 (2005). Even though Mother argues that her parental rights were terminated because she was in a same-sex relationship, she fails to address the district court's stated reasons for terminating her parental rights, which are discussed in depth below. We agree with the State that we would be on solid ground to find that Mother has abandoned any challenge to the factual basis for the termination of her parental rights. Nonetheless, in the context of Mother's arguments, we liberally construe her claim as arguing that the district court's reasons were pretextual and that her same-sex relationship was the real reason for the termination of her parental rights. Accordingly, in the interest of justice, we examine the district court's reasons for termination.

17

*Our standard of review*

A court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2016 Supp. 38-2269(a). In making such a determination, the court considers certain factors listed in the relevant statute, K.S.A. 2016 Supp. 38-2269(b). When a child is not in the physical custody of a parent, the court considers additional factors, such as failure to maintain regular visitation and failure to carry out a reasonable plan directed toward reintegration. K.S.A. 2016 Supp. 38-2269(c)(2) and (3). The existence of any one factor may establish grounds for termination of parental rights. K.S.A. 2016 Supp. 38-2269(f).

We review the evidence in the light most favorable to the State.

> "[W]hen an appellate court reviews a district court's determination that a child is in need of care, it should consider whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence that the child was a [child in need of care]." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

In making our determination, we do not weigh conflicting evidence, judge the credibility of witnesses, or reconsider questions of fact. 286 Kan. at 705.

*The district court's decision*

The district court emphasized that Mother never acknowledged that her partner had injured her child, that Mother had defied the terms of the reintegration plan requiring her to terminate her relationship with that partner, and that Mother had stated her intention to reintroduce that partner into her children's lives:

18

"The abuse of [the son] occurred while he was in the custody of his mother. She is the one that placed him in the care of [her partner] and as a parent, bears some responsibility. The fact that she fails to acknowledge that her partner perpetrated this terrible beating of her small child in spite of the overwhelming evidence and that if custody is returned to her, intends to reintroduce [her partner] into her children's lives, meets the criteria of 38-2269(b) (2, 4, & 8). Her attitude and conduct since the children were placed in protective custody clearly demonstrates a lack of effort on her part to adjust her circumstances to meet the needs of her children. The case plans formulated to reintegrate the children failed due to her lack of participation and defiance of the requirement that she terminate her relationship with [her partner]. Finally, these children have had little or no contact with [Mother] for some 22 to 24 months as a result of [Mother's] intentional decision not to abide reasonable requirements of the case plan."

The court found clear and convincing evidence that Mother was unfit and that her conduct was unlikely to change in the foreseeable future. Its decision specifically relied on K.S.A. 2016 Supp. 38-2269(b)(2), (4), and (8), though it also referenced K.S.A. 2016 Supp. 38-2269(b)(7) and (9) and (c)(2) and (3).

*Our review of two factors*

Although Grandmother and the State point to multiple factors supporting the district court's decision, we address only two.

First, K.S.A. 2016 Supp. 38-2269(b)(4) directs the court to consider "physical, mental or emotional abuse or neglect or sexual abuse of a child." Here, there is no doubt that Mother's partner abused or neglected the son after Mother left him in her care. The son's injuries, which included a broken leg, bruising to his inner ear, extreme swelling in his penis, and injuries to his scrotum and groin, were not present before Mother went to work. Those injuries were not consistent with ordinary childhood bumps and bruises and were indicative of child abuse.

19

Kansas recognizes a natural and common-law duty to protect one's children from abuse. *In re S.D.*, 41 Kan. App. 2d 780, 788, 204 P.3d 1182 (2009) (citing *State v. Edgar*, 281 Kan. 47, 68, 127 P.3d 1016 [2006]). Our criminal statutes impose a duty on parents to protect their children from abuse as well. K.S.A. 2016 Supp. 21-5601(a)-(b) (child endangerment and aggravated child endangerment); K.S.A. 2016 Supp. 21-5602 (child abuse). Even when the parent whose rights are at issue does not commit the abuse suffered by a child, a parent may be held responsible for failing to take proper precautions to protect a child from abuse. *In re A.B.*, 12 Kan. App. 2d 391, 392, 746 P.2d 96 (1987). And a district court that observes the abuse of one child "should not be forced to refrain from taking action until the next child suffers injury." 12 Kan. App. 2d at 392. This factor weighs heavily against Mother.

Second, we consider K.S.A. 2016 Supp. 38-2269(b)(8), which states that the court may find "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." The district court's main issue with Mother during the reintegration process was Mother's refusal or failure to terminate her relationship with her abusive partner. At trial, Mother acknowledged that despite the evidence and the fact that her partner had pled guilty to criminal acts against her son, she did not believe that her partner abused her son. Mother admitted that she continued her relationship with her partner during the reintegration efforts and testified that she would reintroduce her partner into the children's lives if she were granted custody.

Throughout the reintegration process and trial, DCF and Saint Francis made it clear to Mother that she would have to choose between her abusive partner and her children. Mother consistently chose her partner, which in turn caused her to have little to no contact with her children. By refusing to end her relationship with the person who abused her child, Mother failed to adjust her conduct to meet her children's basic needs for safety. Mother must now live with the consequences of that choice. This factor independently warrants termination of Mother's parental rights. See, *e.g.*, *In re C.W.*, No.

20

113,547, 2015 WL 5311260, at *18-19 (Kan. App. 2015) (unpublished opinion) (finding Mother's decision to remain with Father despite credible allegations Father sexually abused child demonstrated unfitness); *In re D.M.*, No. 112,445, 2015 WL 2414508, at *7 (Kan. App. 2015) (unpublished opinion) (finding Mother's violations of a no-contact order with her nonabusive boyfriend did not prove her unfit, but stating "[h]ad the evidence directly established that [the boyfriend] was abusive toward Mother or the children, our decision would be different").

Although other factors addressed by the district court and the State may well be supported by clear and convincing evidence, we find it unnecessary to address them. The two factors addressed above are shown by clear and convincing evidence, and a rational factfinder could have found it highly probable that Mother is unfit by reason of conduct or condition which renders her unable to care properly for her children.

Mother has shown no inclination to change her conduct, but to the contrary, has stated her intention not to change; thus, her unfitness is unlikely to change in the foreseeable future.

Was the termination in the best interests of the children? That determination is entrusted to the district court's sound discretion based on a preponderance of the evidence. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). The district court understood the relevant facts and applied the proper law. And its conclusion is one other judicial officers would have reached under comparable circumstances. So we find no abuse of discretion in the district court's decision that the termination of Mother's parental rights was in the best interests of the children. Therefore, we affirm the termination of Mother's parental rights as to these children.

Affirmed.